EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN, demandante y recurrente, *v.* BANCO POPULAR DE PUERTO RICO, demandado y recurrido.

*Número:* R-63-288      *Resuelto:* 20 de enero de 1965

646

*Félix Ochoteco, Jr.,* abogado de la recurrente; *Gabriel de la Haba, Rafael Baragaño, Jr., Garrard Harris, Ramón Mellado González, R. J. Baragaño Amadeo,* y *E. C. Baragaño Amadeo,* abogados del recurrido.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

La demandante recurrente, Employers Mutual Liability Insurance Co. of Wisconsin, satisfizo a la Cooperativa de Crédito de Personal y Presupuesto la cantidad de $2,777.33 en cumplimiento de su obligación bajo una fianza expedida por ella a favor de dicha Cooperativa, para responderle de las pérdidas que pudiera sufrir por razón de desfalcos, falsificaciones o malversaciones de sus fondos por acción u omisión de sus empleados. Bajo el derecho reservado en esa misma fianza de subrogarse en lugar del derecho de la Cooperativa a reclamar contra terceras personas por tales actos de malversación, falsificación o desfalco de sus empleados cubiertos por la fianza, la recurrente interpuso demanda en la Sala de San Juan del Tribunal Superior contra el Banco Popular de Puerto Rico, alegando que dicho Banco pagó cheques contra la cuenta de la Cooperativa librados a favor de determinados socios en la cantidad de $2,777.33 que luego el Tesorero de la Cooperativa cobró apropiándose de dicha suma.

El caso fue sometido a la Sala sentenciadora sobre los siguientes hechos estipulados por las partes:

"1. Que la demandante es una compañía mutua autorizada a hacer negocios de seguros en Puerto Rico, siendo el demandado un banco establecido conforme a la Ley de Bancos de Puerto Rico y haciendo negocios en esta Isla.

"2. Que la Cooperativa de Crédito de Personal y Presupuesto, que es una sociedad cooperativa de crédito organizada conforme a la Ley de Cooperativas de Puerto Rico e integrada por los empleados de las oficinas de Personal y Presupuesto del Gobierno del Estado Libre Asociado de Puerto Rico.

"3. Que la citada Cooperativa, durante todas las fechas que se dirán, tenía una cuenta corriente en el Banco demandado en su oficina principal de la ciudad de San Juan, Puerto Rico y en la que hacía imposiciones de dinero para luego girar contra dichos depósitos a través de cheques u órdenes de pago librados por ella por conducto de agentes autorizados al efecto.

"4. Que la demandante, en las fechas que se dirán, tenía librada y en vigor, una fianza para responderle a dicha Cooperativa de cualquier daño o perjuicio que pudiera la misma recibir por cualquier pérdida que sufriera como consecuencia o por razón de desfalco, falsificaciones o malversación de los fondos de la misma por acción u omisión de sus empleados y específicamente del que se mencionará oportunamente, habiéndose librado dicha fianza por la demandante previo el pago de las correspondientes primas a ella por la mencionada Cooperativa.

"5. Que a tenor con la citada fianza, la demandante quedaba subrogada en el lugar y en los derechos de la expresada Cooperativa por el monto de todo pago que como fiadora hiciera ella a la Cooperativa por razón de desfalco, falsificación o malversación de los fondos de dicha Cooperativa por parte de los empleados de ésta y con derecho la demandante, a virtud de tal subrogación, a demandar y recibir para sí todo reembolso que tuviera derecho a percibir la Cooperativa de terceras personas por actos de malversación, falsificación o desfalco de los empleados cubiertos por la expresada fianza.

"6. Que la Cooperativa libró contra su citada cuenta corriente en el Banco demandado y teniendo aquélla fondos suficientes para ser pagados con cargo a dicha cuenta corriente, los siguientes cheques a favor de las personas que se mencionarán, las que a su vez eran socias de la Cooperativa, habiendo tenido lugar dichos libramientos de cheques en las fechas y por las cantidades que a continuación se expresa:

| "Cheque Núm. | Fecha | Cantidad | Beneficiario |
|---|---|---|---|
| 660 | 1-20-61 | $ 260.00 | Ruth M. Rodríguez |
| 676 | 1-31-61 | 270.00 | Ana M. Gallego |
| 724 | 3- 3-61 | 300.00 | Ruth M. Rodríguez |
| 789 | 4-28-61 | 300.00 | Ruth M. Rodríguez |
| 974 | 8-17-61 | 95.00 | Eva González |
| 994 | 9- 1-61 | 188.57 | Amelia González Vda. Negrón |
| 1037 | 10- 2-61 | 260.00 | Eva González |
| 1103 | 11- 3-61 | 258.05 | Ruth M. Rodríguez |
| 1120 | 11-10-61 | 129.02 | Gladys González Latorre |
| 1177 | 12-12-61 | 168.72 | Gladys González Latorre |
| 1278 | 12-29-61 | 160.00 | Carmen J. Fillot |
| 69 | 3- 2- 62 | 267.97 | Ruth M. Rodríguez |
| 87 | 3- 9- 62 | 120.00 | Candita Miranda García |

TOTAL: $2,777.33

"7. Que todos dichos cheques fueron librados por la Cooperativa a través de las firmas de su Presidente y Tesorero respectivamente, los señores Enrique Piñero López y Manuel García Escarfullery, con excepción de los cheques numerados anteriormente 1037, 1190 y 1177, que lo fueron por el Vice-Presidente y Tesorero respectivamente, los señores Elemaniel Pagán y dicho Manuel García Escarfullery, siendo a la fecha en que se libraron los mencionados cheques, las tres citadas personas oficiales de la referida Cooperativa, autorizadas para hacer los citados libramientos y con sus firmas debidamente registradas en el Banco demandado en sus oficinas principales de San Juan, P.R.

"8. Que tanto el Presidente como el Vice-Presidente de la Cooperativa antes citados, cuando autorizaron con sus firmas el libramiento de los citados cheques y en lo que a cada uno de ellos atañe, así lo hicieron, por haber creído de buena fe la información que dicho Tesorero le dio a ellos, de que las cantidades de los expresados cheques eran préstamos que le hacía la Cooperativa a los beneficiarios de los mismos en su concepto de socios de aquélla.

"9. Que ninguna de las personas que aparecían como beneficiarias en los citados cheques, tenía conocimiento del libramiento de los mismos, ni habían solicitado préstamo alguno a la Cooperativa por el importe de los mismos o por ninguna otra cantidad en relación con tales cheques.

"10. Que el libramiento de los expresados cheques en las fechas, por las cantidades y a favor de los beneficiarios antes dichos, sólo obedeció a un plan o treta puesto en ejecución exclusivamente por dicho Manuel García Escarfullery, como tal Tesorero de la Cooperativa para defraudar a la Cooperativa para exclusivo beneficio de él en el importe de los mencionados cheques, a sabienda él, por tanto, que si bien las citadas personas que figuraban como beneficiarias en los mismos, eran socios en esa fecha de la Cooperativa, ninguna de ellas estaba enterada de su libramiento, ni iban a recibir el importe de dichos cheques.

"11. Que el citado Tesorero de la Cooperativa, una vez librados por él y los oficiales de la Cooperativa todos los mencionados cheques reseñados en el apartado 6 de la presente Estipulación, estampó en concepto de endoso al reverso de cada uno de dichos cheques, la supuesta firma de sus respectivos beneficiarios.

"12. Que una vez endosados en la forma antes dicha los expresados cheques, los mismos fueron pagados por el Banco demandado mediante los endosos que aparecen al dorso de los citados cheques, copia fotostática de cuyos endosos de los referidos 13 cheques se acompañan a la presente Estipulación.

"13. Que el importe de los aludidos cheques, una vez hechos efectivos por el Banco demandado, fue cargado a la citada cuenta corriente de la Cooperativa con ese Banco.

"14. Que a su vez la demandante, de conformidad con la póliza a que se ha hecho mención en el apartado 4 de la presente Estipulación, procedió a reembolsarle a la Cooperativa los $2,777.33, importe total de los citados cheques, cuya cantidad a su vez el Banco demandado le había cargado en la cuenta corriente de ella, según lo anteriormente expuesto.

"15. Que a tenor con la citada póliza y del pago hecho por la demandante a la Cooperativa de los citados $2,777.33, ha quedado subrogada la demandante en el lugar y sitio de la Cooperativa en la causa de acción ejercitada por la demandante en el caso del epígrafe.

"16. Y por último, estipulan las partes que el referido Tesorero de la Cooperativa, Manuel García Escarfullery, se declaró culpable del delito de falsificación por infracción al Art. 413 del Código Político de P.R. en relación con el libramiento y falsificación de los referidos 13 cheques y el recibo por él del importe total de los mismos, conforme aparece de la Certificación que se acompaña a la presente Estipulación, librada por el Secretario

de la Sala de San Juan (Criminal) del Tribunal Superior de P.R."

A tenor de los hechos estipulados la Sala sentenciadora exoneró de responsabilidad al Banco demandado y declaró sin lugar la demanda. En derecho, su fallo descansó en el inciso 3 del Art. 362 del Código de Comercio, Ed. 1932, que en Puerto Rico es el Art. 10 de la Ley Uniforme de Instrumentos Negociables, Ley Núm. 17 de 22 de abril de 1930—19 L.P.R.A. (ed. 1961) sec. 10.

Dispone el Art. 2 de la referida Ley que un documento es negociable si es pagadero a la orden o al portador. Un documento es pagadero a la orden cuando se libra a la orden de persona determinada—Art. 9—o a favor de una persona o a su orden. Será pagadero al *portador*—Art. 10— . . . 3.—Cuando es pagadero a la *orden* de persona ficticia o que no existe y el hecho es conocido por la persona que lo otorgó en esa forma . . . . 5.—Cuando el único y último endoso está en blanco.

Dispone también la dicha Ley Uniforme—Art. 31— que si un documento es pagadero al portador, queda negociado por la entrega, si a la orden, por el endoso del tenedor completado por la entrega. El endoso en blanco—aquél que no menciona endosatario, firma del endosante—hace del documento uno pagadero al *portador* y se negocia mediante entrega. Art. 35. Finalmente—Art. 186—el cheque se consideraría letra de cambio contra un banco pagadera a su presentación.

A tenor de los hechos en el récord aceptados y estipulados, los cheques expedidos en este caso, si bien lo fueron a la orden o a favor de personas determinadas, tienen en ley, por razón de la manera en que se libraron según esos hechos, el concepto de documentos *al portador*. Como tal, eran negociables meramente por la entrega. Art. 10, incisos 3, 5; Art. 31; Art. 35, de la Ley Uniforme, antes citados. Véase: *Caguas Company, Inc.* v. *López*, 59 D.P.R. 264 (1941). El

pretendido endoso era innecesario y supérfluo para la negociación, considerando la ley esos cheques documentos al portador negociables por su entrega. En consecuencia, el hecho de que el pretendido endoso se falsificara no tenía efecto en ley alguno, ni cambiaba la naturaleza de al portador de los cheques.

No tenemos precedentes de este Tribunal sobre una situación como la de autos, ni interpretativos del inciso 3 del Art. 10, ya citado. Pero siendo ésta una disposición de una Ley Uniforme sí hay abundantísima expresión judicial sancionada por los muchos años a través de los Estados y en la jurisdicción federal, y los principios anteriormente expuestos están acordes con esa expresión judicial autorizada. Se ha interpretado el inciso 3 del Art. 10 con uniformidad de criterio al efecto de que la "persona ficticia o que no existe" a quien se le hace pagadero un documento a la orden no tienen que ser personas sin existencia en la vida o nombres inventados, para que se le considere al portador. Pueden ser personas reales y conocidas, como eran los socios de la Cooperativa a favor de quienes se expidieron fraudulentamente los cheques. El concepto de la ficción o inexistencia gira en torno a la juridicidad del negocio transado, en el sentido de que nunca fue la intención del librador del cheque el que esas personas tuvieran interés en el mismo y realmente se beneficiaran con dicho negocio. *Crosswaite* v. *Pierce*, 355 P.2d 160, 56 Wash.2d 725; *Johnston* v. *Exchange Nat. Bank of Tampa*, 9 So.2d 810; *Bourne* v. *Maryland Casualty Co.*, 192 S.E. 605; *Seidman* v. *North Camden Trust Co.*, 7 A.2d 406; *Security-First Nat. Bank* v. *Bank of America Nat. Trust & Savings Ass'n*, 137 P.2d 452; *Security-First Nat. Bank of Los Angeles* v. *Bank of America Nat. Trust & Savings Ass'n*, 129 P.2d 424; *Swift & Co. Inc.* v. *Bankers Trust Co. et al.*, 19 N.E.2d 992; *Pennsylvania Co. etc.* v. *Federal Reserve Bank*, 30 F.Supp. 982; *Goodyear Tire & R. Co.* v. *Wells Fargo Bank & Union Trust Co.*, 37 P.2d 483; *Atlanta & Lowry Nat.*

*Bank* v. *First Nat. Bank of Carrollton*, 145 S.E. 521; *Rubin-
stein* v. *Goldkind*, 255 F.2d 530; *Muller & Martínez* v. *Lib-
erty Ins. Bank*, 218 S.W. 465.

No se trata en este caso, a los efectos de la responsabi-
lidad del Banco, de la firma falsificada o adulterada del de-
positante y librador de un cheque. Cf. *Portilla* v. *Banco Po-
pular*, 75 D.P.R. 100 (1953). Según los hechos estipulados, el
Tesorero de la Cooperativa estaba autorizado ante el Banco
para librar cheques contra la cuenta de aquélla. Su firma en
estos cheques era genuina. El hecho de que los cheques estu-
vieran también firmados por otros funcionarios, inocentes de
la intención del Tesorero, no altera, en lo que al Banco res-
pecta, el carácter de documentos al portador que los cheques
tenían en virtud de ley. Tampoco tenemos precedentes nues-
tros en este respecto, pero la doctrina con sentido prevale-
ciente así lo demuestra. *Goodyear Tire & Rubber Co. of Cali-
fornia* v. *Wells Fargo Bank & Union Trust Co.*, antes citado;
*Dorsey* v. *Houston National Bank*, 338 S.W.2d 540; *Goble
Indemnity Company* v. *First National Bank*, 133 S.W.2d
1066; *Pennsylvania Co.* v. *Federal Reserve Bank*, antes ci-
tado; *Pannonia Bldg. & Loan Ass'n* v. *West Side Trust Co.*,
108 Atl. 240.

La estipulación de hechos no entra en detalle en cuanto al
trámite reglamentario en la disposición de estos préstamos a
los socios, y todo indica que la determinación y la respon-
sabilidad descansaba mayormente o principalmente en el
Tesorero, y que las otras firmas eran materia de trámite.
De haber existido una más directa intervención o determina-
ción de esos funcionarios se habrían dado cuenta pronta-
mente de que no existían préstamos solicitados por tales per-
sonas, o de la situación de sus deudas con la Cooperativa.

■ Finalmente, asumiendo que en derecho el Banco res-
pondiera en una situación así, queda el hecho de que la Coo-
perativa pudo haber evitado gran parte de la pérdida con al-
guna diligencia. La estipulación demuestra que estas transac-

ciones fraudulentas se extendieron desde el 20 de enero de 1961 hasta el 9 de marzo de 1962, por más de un año. Demuestra también que en ese período aparecen cinco préstamos hechos al mismo socio, Ruth M. Rodríguez, uno en 20 de enero de $260.00 y otro menos de dos meses después, por $300; otro sólo un mes más tarde, por $300 también; un cuarto en 3 de noviembre de 1961 y otro el 2 de marzo de 1962. Aparece un préstamo a Eva González el 17 de septiembre por $95.00 y otro dos meses después por $260.00. Dos préstamos concedidos a Gladys González Latorre en el término de un mes. Según la tradición, y no hay prueba en contrario, la Cooperativa tuvo que haber recibido devueltos los cheques primeramente expedidos. Fácil le hubiera sido, con alguna diligencia, comprobar la inexistencia de esos préstamos y deudas asumiendo, como es lógico asumir, que llevaba récord de los préstamos otorgados a sus socios y de los pagos de éstos. Aunque aquí no se trata, como en *Portilla*, de la falsificación de la firma del propio depositante, y se trata aquí de cheques considerados al portador negociables por la mera entrega, los principios que sentamos en *Portilla* en cuanto a la diligencia que debe observar un depositante tienen igual virtualidad en este caso, en lo que a la evitación de pérdida concierne.

*Se confirmará la sentencia que declaró sin lugar la demanda de la fiadora.*